UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X
                        :

UNITED STATES OF AMERICA,          :

                        :

          -v-              :        S2 21 Cr. 766 (JPC)

                        :

                        :        <u>OPINION AND ORDER</u>

JUSTIN HAMPTON,               :

             Defendant.    :

                        :

----------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

       Following an eight-day jury trial, Defendant Justin Hampton was convicted of conspiring to commit robbery affecting interstate commerce ("Hobbs Act robbery"), in violation of 18 U.S.C. § 1951 (Count One); committing a Hobbs Act robbery on or about October 19, 2021, in violation of 18 U.S.C. §§ 1951 and 2 (Count Two); committing a Hobbs Act robbery on or about November 10, 2021, in violation of 18 U.S.C. §§ 1951 and 2 (Count Three); carrying or using a firearm in relation to, or possessing a firearm in furtherance of, the robbery charged in Count Two, or aiding and abetting the same, with the firearm having been brandished, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i)-(ii) and 2 (Count Four); and knowingly possessing a firearm after a felony conviction, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 2.  Hampton has moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 on Counts Two and Four for insufficient evidence and on Count Five as violative of the Second Amendment of the U.S. Constitution, particularly in light of the Supreme Court's recent decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

For reasons that follow, the Government presented sufficient evidence at trial to support the jury's verdict as to Counts Two and Four.  Drawing all inferences in the Government's favor, the evidence established, beyond a reasonable doubt that, *inter alia*, Hampton participated in a robbery of a Family Dollar on Soundview Avenue in the Bronx on October 19, 2021, and that the robbery affected interstate commerce.  The Government's proof further allowed the jury to find, beyond a reasonable doubt, that during and in relation to that October 19, 2021 robbery, Hampton knowingly used and carried a firearm, and that he possessed a firearm in furtherance of the robbery, and aided and abetted the same, with the firearm being brandished during the robbery.  As to Count Five, the Second Circuit upheld the constitutionality of section 922(g)(1) in *United States v. Bogle*, 717 F.3d 281, 281-82 (2d Cir. 2013) (per curiam), and that precedent has not been disturbed by *Bruen*.  Accordingly, Hampton's motion is denied.

## I.  Facts and Procedural History[1]

Hampton was charged in a Superseding Indictment in five counts: (1) conspiracy to commit Hobbs Act robbery from October through November 2021; (2) committing a Hobbs Act robbery of a dollar store on Soundview Avenue in the Bronx on October 19, 2021; (3) committing a Hobbs Act robbery of a pizza restaurant on Bruckner Boulevard in the Bronx on November 10, 2021; (4) knowingly using and carrying a firearm during and in relation to, and possessing a firearm in furtherance of, the Soundview Avenue dollar store robbery, and aiding and abetting the same, with the firearm having been brandished; and (5) knowingly possessing a firearm after a felony

---

[1] The following facts are drawn from the testimony and exhibits presented at trial.  *See United States v. Shannon*, No. 21 Cr. 56 (JPC), 2022 WL 17581558, at *1 (S.D.N.Y. Dec. 12, 2022); *United States v. Dore*, No. 12 Cr. 45 (RJS), 2013 WL 3965281, at *1 n.1 (S.D.N.Y. July 31, 2013).  The trial transcript, Dkts. 100, 102, 104. 106, 108, 110, 112, 126, is cited as "Tr." while "Exh." reflects citations to the exhibits received in evidence at trial.

conviction.  *See* Dkt. 47 ("Indictment") ¶¶ 1-5.[2]  Prior to trial, the Court granted Hampton's request

to bifurcate trial on Count Five—the felon-in-possession count—from the other four counts.  Dkt.

83; *see also* Tr. at 5-10 (explaining the basis for the Court's decision to bifurcate).  Following one

day of voir dire, *see* Nov. 28, 2022 Minute Entry, trial as to Counts One through Four (the

"Robbery Phase") commenced on November 29, 2022, *see* Tr. at 56.  On December 7, 2022, the

jury returned a verdict of guilty on the first four counts, including a finding that a firearm was

brandished with respect to Count Four.  *Id.* at 1074-75.  The Court then informed the jury of Count

Five and conducted a brief trial as to that count (the "Gun Phase").  *Id.* at 1077-95.  The jury

returned a guilty verdict as to Count Five later that day.  *Id.* at 1103.

## A.    The Robbery Phase

The Government presented evidence during the Robbery Phase to establish that Hampton's

crew (which also included Haskins and Haskins's cousin, Brandon Needham) committed fourteen

robberies of various establishments in the Bronx, Brooklyn, and Queens in October and November

2021.  *See* Exhs. 1500-01 (charts summarizing robberies and collecting exhibits).  The victim

establishments were ten 7-Eleven stores, two Family Dollar stores, one gas station convenience

store, and one Little Caesars pizza restaurant.  *See id.*

The robberies largely shared similar patterns.  Each robbery occurred either late at night or

in the early hours of the morning.  Exhs. 1100[3], 1500.  The robbers would enter the target store

wearing masks.  *See, e.g.*, Exhs. 101A.2, 102A.1-.2, 103A.1, 104A.1, 105B, 106A, 107B.1,

---

[2] Hampton was charged with co-defendant Terrell Haskins.  *See generally* Dkt. 5.  On June 16, 2022, Haskins pled guilty to conspiracy to commit Hobbs Act robbery and to committing a Hobbs Act robbery of a convenience store on Westchester Avenue in the Bronx on October 26, 2021.  *See* June 16, 2023 Minute Entry.  On November 7, 2022, he was sentenced to forty-eight months' imprisonment on each count to run concurrently and three years of supervised release. *See* Dkt. 71.

[3] 1100-series exhibits are stipulations entered into by the parties.

108A.1, 109A, 110D.1, 111A.1, 112D.1, 113A.1, 113C.1, 114A.[4]   One of the robbers, who was tall with a slim build, would often wear an inside-out black, hooded-sweatshirt with a gray stripe and red tag on the back (the "Hoodie").   *See, e.g.*, Exhs. 302B-C, 303A.4, 303B.2, 304A.1, 304A.4, 311A.1-.2, 313B.1-.2 (surveillance video stills of the robber in the Hoodie);[5] *see also* Tr. at 243, 266, 316, 359.   The Government argued that this robber was Hampton.   *See, e.g.*, Tr. at 872-73, 879.   After entering the store, the robber in the Hoodie would display what appeared to be a firearm and demand money.   *See, e.g.*, Exhs. 301B.2, 303A.4, 306A.1, 307E, 310A.1, 311C.3; *see also, e.g.*, Tr. at 75, 183, 186, 330-31, 535.   Another robber, who had a heavier build, sometimes would act as a lookout.   *See, e.g.*, Exhs. 303A.4, 304A.4, 306A.3, 307B, 310A.2; *see also* Tr. at 284.   The Government argued that this individual was Haskins.   *See, e.g.*, Tr. at 882, 884, 887, 890-91, 894. The robbers typically stole cash, lottery tickets, and/or cigarettes, Exhs. 1100, 1500, and placed them in a black backpack with white trim (the "Backpack").   *See* Exhs. 302C.2, 302D.1-.2, 303A.2, 304A.3, 307A.2-.3, 308B.2, 309A.3, 310B.1-.2, 311C.1-.2, 313B.1; Tr. at 225-26, 257, 275, 294, 304-05.   The Backpack resembled a backpack that was stolen during the first robbery, which occurred on October 18, 2021 and was of a different Family Dollar in Brooklyn.   *See* Exhs. 1100 ¶ 1, 1500; Tr. at 221-28.[6]

---

[4] 100-series exhibits are surveillance videos taken from inside the stores or from cameras around other nearby buildings shortly before, during, and after each robbery.   The last two digits of each exhibit correspond to the number of the robbery as listed in the Government's summary chart at Exhibit 1500.

[5] 300-series exhibits are still screenshots from the surveillance videos in the 100-series exhibits.   As with the surveillance videos, the last two digits of each 300-series exhibit correspond to the number of the robbery as listed in the Government's summary chart at Exhibit 1500.

[6] In fact, when showed a surveillance video still from a subsequent robbery of the Backpack, the employee of the Family Dollar from the first robbery identified the Backpack as his own.   Tr. at 541-43.   As such, the Government argued at trial that the Backpack was the same throughout each of the robberies.   *Id.* at 886.

The perpetrators typically would arrive in the vicinity of the victim store in a black Lincoln MKT SUV, and then, after committing the robbery, would flee in the same vehicle. *See, e.g.*, Exhs. 102M.1, 103L.4, 106M.1, 107L.1, 108N, 110M.1, 112L.1, 112M.1 (surveillance footage showing a black Lincoln SUV at or near the scene of and/or fleeing certain robberies). The Government presented evidence that registered to Hampton was a 2013 black Lincoln MKT with a New York license plate JNK3401 ("Hampton's Car") and argued that Hampton's Car was that getaway vehicle. *See* Exh. 520 (DMV printout of Hampton's Car's registration); Exhs. 402A-B, 403A-E, 406A-B, 407A-D, 410C-D, 411B-D, 412B-E (license plate reader evidence showing Hampton's Car traveling to and/or from the vicinity of certain robberies at times consistent with when those robberies occurred); *see also, e.g.*, Tr. at 873, 877-79.[7] In the days following those robberies during which lottery tickets were stolen, Hampton and Haskins would scan and cash some of the stolen lottery tickets. *See* Exhs. 1007A, 1010A, 1011I (New York Lottery Commission records of stolen tickets); Exhs. 120A-C, 121A.1, 124A-H (surveillance footage showing Hampton and Haskins cashing lottery tickets); Tr. at 374-80, 383-90. Hampton once drove a black Lincoln MKT to a store to cash the lottery tickets. Exhs. 122B.2, 322A-B, 343A; Tr. at 387-90.

The second of these robberies—the robbery charged in Counts Two and Four, *see* Indictment ¶¶ 2, 4—was of a Family Dollar store at 415 Soundview Avenue in the Bronx and occurred on October 19, 2021 (the "Second Robbery"). Exh. 1100 ¶ 2. License plate reader results revealed that, on the evening of October 19, 2021, Hampton's Car traveled from Queens into

---

[7] In addition to the DMV records, other evidence at trial established that this vehicle belonged to Hampton. *See, e.g.*, Exhs. 656 at 4 (text message sent from Hampton's cellphone referring to the car as his "baby"), 661 at 3 (text message sent from Hampton's cellphone referring to the car as his "new whip" and a "2013 Lincoln MKT"), 619.1-.2 (photographs from Hampton's cellphone of Hampton standing in front of the car).

Manhattan via the Queensboro Bridge at 7:49 p.m. and then crossed into the Bronx via the Willis Avenue Bridge at 8:09 p.m.  Exhs. 402A-B; Tr. at 556.  Surveillance video from that evening captured a black Lincoln MKT driving down Bolton Avenue in the Bronx.  Exh. 102L.1.  The car then made a U-turn, pulled over, and parked on the same street, with its hazard lights illuminated. *Id.*; *see also* Tr. at 238-39.  Several individuals exited the vehicle and began walking in the direction of Soundview Avenue—the next block over.  Tr. at 239-40; Exh. 1402A.  Upon reaching Soundview Avenue, the individuals crossed the street and began walking toward the Family Dollar.  Tr. at 233-34; Exh. 1402A.  One of the individuals appeared to wear the Hoodie while another appeared to carry the Backpack.  Tr. at 234-35, 243; Exhs. 302A-B, 302C.1-.2, 302D.1.

The manager of the Family Dollar (the "Manager") testified that five individuals "wearing dark clothing" and masks walked into the store around 9:50 p.m.—shortly before closing time.  Tr. at 182-83; *see also* Exhs. 802A (911 call in which the Manager exclaims that "we just got robbed" at gunpoint" by "five males, all armed, black, with a gun"); 1100 ¶ 2.  The individual wearing the Hoodie walked up to the Manager and tapped her on the shoulder.  Tr. at 186, 229-30, 234-35. She observed him "holding something that looked like a gun," which she explained was "black and gold, something like that."  *Id.* at 183; *see also id.* at 186.   The Manager then escorted the men to the register area and showed them the safe.  *Id.* at 183.  She informed them that "it takes a couple minutes to open" the safe, but that the police would likely arrive before she was able to open it.  *Id.*  The men then rifled through the registers and stole "high value items" such as cigarettes and speakers.  *Id.* at 183-84.  In total, the robbers stole $1,716 in cash in addition to the cigarettes and speakers.  Exh. 1100.  After completing the robbery, the individuals fled down Bolton Avenue towards the parked black Lincoln MKT.  Tr. at 235-36, 240-41; Exhs. 102D.1, 102E.1, 102M.1.  The individuals then entered the vehicle and drove away down Bolton Avenue.

Tr. at 241.  After the robbers had left her store, the Manager called 911 and recounted what had just occurred, repeatedly noting that the robbers were "armed" or holding a "gun."  Exh. 802A (reporting "[w]e just got robbed at gunpoint" and twice describing the robbers as "black, with a gun").  The police arrived at the store shortly thereafter.  Exh. 902A.1 (officer body camera footage from 10:02 p.m. that same night showing the Manager looking for surveillance footage of the robbery).

On November 2, 2021, after ten more robberies had occurred in a similar fashion, *see* Exhs. 1100 ¶¶ 3-12, 1500, law enforcement seized Hampton's Car as it was parked near Haskins's apartment on Torry Avenue in the Bronx.   Tr. at 700-02; *see also id.* at 144-45 (landlord of the Torry Avenue apartment testifying that Haskins was her tenant).  Later that day, New York City Police Department ("NYPD") Detective Christopher Goldrick, who was assigned to the joint Drug Enforcement Task Force, *id.* at 832-33, conducted a search of the vehicle pursuant to a warrant. *Id.* at 837.  While searching the vehicle, Detective Goldrick noticed a separation in the lining of the car's sunroof which appeared to be "out of place."  *Id.* at 839.  When Detective Goldrick "pulled down the lining and looked into where that anomaly was," he found a black and silver Smith & Wesson .22 caliber pistol with a blue handle (the "Smith & Wesson"), which resembled the gun used by the robber in the Hoodie (who the Government argued was Hampton) in several of the robberies.  *Id.* at 397 (NYPD Detective Marc Devito identifying "the firearm found in the car" as the Smith & Wesson), 840 (Detective Godlrick testifying to finding the firearm in Hampton's Car); *see* Exhs. 226, 235 (photographs of the Smith & Wesson as found in Hampton's Car), 700 (the Smith & Wesson); *see also* Exhs. 303A.2, 306A.1, 307E, 308A.2, 309A.2, 310C.2 (surveillance video stills of a robber using something resembling the Smith & Wesson during various robberies).  Shortly after Hampton's Car was seized, a cellphone belonging to Hampton,

Exhs. 703 (the "Hampton Cellphone"), 1102 ¶ 1, made over thirty phone calls, conducted Google searches for "can NYPD go into your car legally without a warrant" and "7 eleven robbery NYC," viewed several articles about the robberies, *see* Exhs. 240-41, 625, 625.1-.9, 657, 1201 at 14, and sent text messages to someone named "Spicy mama" complaining several times that "my car is gone," Exhs. 640, 644.

The Government offered evidence that, despite the seizure of his car, Hampton proceeded to commit two more robberies, including a November 10, 2021 robbery of a Little Caesars on Bruckner Boulevard in the Bronx, charged in Count Three of the Indictment. *See* Exh. 1100 ¶ 14; *see also* Indictment ¶ 3. On these occasions, the lead robber (argued by the Government to be Hampton) brandished a pellet gun during the robbery and used a motorized scooter as his getaway vehicle. *See* Exhs. 113A.1, 113S.1, 113T.1, 113U.1-.3, 114A, 114S.1-.4, 114T.1-.2. The robber also wore distinctive orange gloves and stuffed money into a brown reusable shopping bag with green writing. *E.g.*, Exh. 114A.

On November 16, 2021, law enforcement executed a search of Haskins's apartment on Torry Avenue. Tr. at 82-85, 390. Upon entering, the officers found Hampton sleeping on the couch in the living room area with a black ski mask around his neck. Tr. at 91, 392-93; Exh. 729. Located near him was the Hampton Cellphone and a brown shopping bag with green writing which contained orange gloves and a black pellet gun. Tr. at 94-103; Exhs. 703-04, 710. Law enforcement also recovered a black and gold firearm in the nearby bedroom where Needham was located, as well as a scooter outside the apartment. Tr. at 90-91, 107-12; Exh. 706.

Finally, the Government additionally presented evidence from the Hampton Cellphone that further linked Hampton to the robberies. For example, the search history and image cache revealed searches for many 7-Eleven and Family Dollar locations (including the ones that were robbed), as

well as for information related to the robbery pattern. *See* Exhs. 605, 605.1, 610, 610.1-.2, 611, 611.1-.2, 615, 615.1-.255, 616, 616.1-.8, 640, 641-45. The Hampton Cellphone also contained photographs of the Smith & Wesson, Exhs. 622, 622.1-.2, a selfie of a man with a mask (argued by the Government to be Hampton) sitting in a car wearing a black sweatshirt that resembles the Hoodie, Exhs. 617, 617.1; *see also* Tr. at 879, photographs of Hampton's Car, including ones with Hampton standing in front of it, Exhs. 619, 619.1-.8, a photograph of a scooter, Exhs. 621, 621.1-.3, and dozens of images and a video of cash and lottery tickets and other lottery-related items, Exhs. 627, 627.1, 628, 628.1-.137, 630, 630A. Finally, cell site location information showed that the Hampton Cellphone connected to towers in the vicinity of several of the robberies, including the Second Robbery, *i.e.*, the robbery of the Family Dollar charged in Count Two. Tr. at 781-82; Exh. 1201.

## B.     The Gun Phase

During the Gun Phase of the trial, the Government argued that Hampton possessed the Smith & Wesson found in his car during October and November 2021. Tr. at 1078. The Government's case-in-chief on Count Five consisted of two additional stipulations. First, the parties stipulated that the Smith & Wesson was "not manufactured in the State of New York." *Id.* at 1079; Exh. 1103. Second, the parties stipulated that Hampton "was convicted in Kings County Supreme Court of a crime punishable by a term of imprisonment exceeding one year" and that during the relevant time period "Hampton knew that he had been convicted of that crime and knew that it was a crime punishable by a term of imprisonment exceeding one year." Tr. at 1079-80; Exh. 1104.

C.     **Mid-Trial Rule 29 Motion**

On December 6, 2022, after the Government concluded its case-in-chief of the Robbery Phase, Hampton moved for a directed verdict on Counts Two and Four pursuant to Rule 29.  Tr. at 850-51.  With respect to Count Two, the defense noted that "[t]here's no video inside the store," referring to the Family Dollar on Soundview Avenue, apart from a "very brief[,] blurry" "video taken by a cell phone of a surveillance video of the perpetrators entering."  *Id.* at 851.  The defense also questioned the significance of the Manager's testimony, arguing that she "provided no identification, no real description of the robbers, except to say that they were young and she felt like she knew them."  *Id.*     And finally, the defense noted that while "the cell site information . . . puts Mr. Haskins at or near the scene of [the Second Robbery]," it tended to suggest that Hampton was "back at the Torry Avenue apartment at the time of the robbery."  *Id.* With respect to Count Four, the defense argued that "[w]e simply don't know which of the robbers had the gun" and that evidence was lacking to support an aiding and abetting theory.  *Id.* at 851-52.

The Court denied the motion without prejudice.  *Id.* at 861.  The Court pointed to the Manager's testimony and the recording of her 911 call as a basis from which the jury could conclude "that one of the robbers possessed and brandished a firearm when the Family Dollar store was robbed."  *Id.* at 863.  The Court also noted the recovery of firearms from Hampton's Car and "from Torry Avenue, where the defendant was sleeping at the time."  *Id.*  In addition, the Court pointed to surveillance footage from the Second Robbery, which allowed the jury to conclude that Hampton's Car was used in the robberies, as well as license plate reader information from October 29, 2021 showing Hampton's Car enter the Bronx and cell site information showing the Hampton Cellphone near the Family Dollar on Soundview Avenue shortly before the robbery.  *Id.* at 863-64.  Finally, the Court noted that the Hampton Cellphone conducted internet searches of the Family

Dollar store, and contained a selfie of an individual appearing to wear the Hoodie "match[ing the Manager's] testimony as to the individual who had the firearm." *Id.* at 864. The Court concluded that this evidence "is sufficient . . . for the case to go to the jury" as it would allow "the jury to convict on all counts." *Id.* at 865.

Following the conclusion of the trial, the Court set a briefing schedule for Hampton's renewed motion for judgment of acquittal. *Id.* at 1107-08. Pursuant to that schedule, Hampton filed the instant motion on February 10, 2023, Dkts. 116, 117 ("Motion"), the Government filed its opposition brief on March 3, 2023, Dkt. 119 ("Opposition"), and Hampton replied on March 13, 2023, Dkt. 121 ("Reply").

## II. Legal Standard

Federal Rule of Criminal Procedure 29(a) provides that a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." The Rule, however, does not provide license for a judge to "usurp[] the role of the jury." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003). The question is "not whether this court believes that the evidence at trial established guilt beyond a reasonable doubt," *United States v. Brown*, 937 F.2d 32, 35 (2d Cir. 1991), but whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005) (emphasis and internal quotation marks omitted). In conducting this inquiry, the Court may not "assess witness credibility, resolve inconsistent testimony against the verdict, or otherwise weigh the significance of the evidence." *Dore*, 2013 WL 3965281, at *2 (citing *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000)). Moreover, "the law draws no distinction between direct and circumstantial evidence in requiring the government to carry its burden of proof." *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005) (internal quotation marks omitted).

11

"The possibility that inferences consistent with innocence as well as with guilt might be drawn from circumstantial evidence is of no matter to sufficiency analysis because it is the task of the jury, not the court, to choose among competing inferences." *Id.*

Thus, a defendant faces "an uphill battle" and bears "a very heavy burden," as the Court must evaluate the evidence "in light most favorable to the Government, with all reasonable inferences drawn in favor of the verdict." *United States v. Crowley*, 318 F.3d 401, 407 (2d Cir. 2003) (internal quotation marks omitted); *see also United States v. Rosemond*, 841 F.3d 95, 113 (2d Cir. 2016). "A judgment of acquittal is warranted only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (brackets and internal quotation marks omitted). While true that "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt," *Cassese*, 428 F.3d at 99 (internal quotation marks omitted), where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter," *Autuori*, 212 F.3d at 114 (internal quotation marks and brackets omitted).

### III.  Sufficiency of the Evidence

Hampton challenges his convictions on Counts Two and Four for insufficient evidence pursuant to Rule 29. The Court addresses each of these two Counts in turn.

### A.       Count Two:  Hobbs Act Robbery

Count Two charged Hampton with committing the Second Robbery, the October 19, 2021 robbery of the Family Dollar at 415 Soundview Avenue in the Bronx, in violation of 18 U.S.C.

§§ 1951 and 2.  As the Court instructed the jury at trial, the elements of substantive Hobbs Act robbery are as follows:

> First, that Mr. Hampton knowingly obtained or took property of another or attempted to do so;
>
> Second, that Mr. Hampton did so against the victim's will by actual or threatened force, violence or fear of injury, whether immediately or in the future;
>
> Third, that as a result of Mr. Hampton's actions, interstate commerce, or an item moving in interstate commerce was delayed, obstructed, or affected in a way or degree;[8]
>
> And fourth, . . . that Mr. Hampton acted knowingly, willfully, and unlawfully.

Tr. at 1003; *see also* 18 U.S.C. § 1951(a), (b)(1), (b)(3); *United States v. Walker*, 314 F. Supp. 3d 400, 413 (E.D.N.Y. 2018), *aff'd*, 974 F.3d 193 (2d Cir. 2020).  Hampton argues that the evidence was insufficient to sustain a conviction as to Count Two because no direct evidence linked him to the Second Robbery.  Motion at 4.  In particular, Hampton notes that the Manager was unable to identify Hampton or any of the robbers, but rather testified that she "felt . . . at the time" that the robbers were "maybe 18, 19, 20 years old," whereas at the time of the robbery, Hampton was 33 years old.  *Id.* at 4-5 (quoting Tr. at 195-96).  Moreover, the defense argues that "unlike the cell-site data for codefendant Terrell Haskins' phone, the data related to Mr. Hampton's phone did not place him within a block of the Family Dollar store within minutes of the robbery" but rather "was consistent with Mr. Hampton being elsewhere, including possibly at the Torry Avenue apartment." *Id.* at 4.  As a result, argues the defense, "the evidence at trial provided equal or nearly equal circumstantial support for Mr. Hampton not being present at the robbery as it did for the notion

---

[8] The parties stipulated that "Family Dollar engages in interstate commerce by, among other things, purchasing goods that have traveled in interstate commerce."  Exh. 1107 ¶ 2; Tr. at 704.

that Mr. Hampton was present" and "[a]n acquittal on Count Two is therefore the only just result." *Id.* at 5.

Hampton is correct that, unlike with many of the other robberies, the Government did not present surveillance footage from the victim store capturing the Second Robbery,[9] and the Hampton Cellphone did not connect in the immediate vicinity of the Family Dollar while the robbery was taking place. *Id*. at 2. Nor did the Manager identify Hampton as one of the robbers. *Id.* at 4. But the Government nonetheless presented considerable evidence that permitted the jury to conclude, beyond a reasonable doubt, that Hampton was one of the individuals who committed the October 19, 2021 robbery of the Family Dollar.

The first category of such evidence relates to Hampton's Car. DMV information showed that this vehicle, a 2013 black Lincoln MKT with a New York license plate JNK3401, was registered to Hampton. Exh. 520; Tr. at 237-38. License plate reader evidence traced Hampton's Car traveling into Manhattan from via the Queensboro Bridge and then into the Bronx via the Willis Avenue Bridge at approximately 8:09 p.m. on the evening of the Second Robbery. Exhs. 402A-B. The robbery of the Family Dollar then occurred less than two hours later at approximately 9:50 p.m. Exh. 1100 ¶ 2. Surveillance camera footage from the night of October 19, 2021, obtained from a nearby residence, showed a black Lincoln MKT—which the jury easily could have concluded was Hampton's Car—pull on Bolton Avenue, just one street over from the Family Dollar, shortly before the robbery. Tr. at 238-39; Exhs. 102L.1, 1402A; *see also* Exh. 1108

---

[9] As Detective Devito testified, "there were technical difficulties with downloading" the footage from the Family Dollar's surveillance cameras. Tr. at 230. That said, the Government did present two short cellphone videos "capturing surveillance video recordings taken at [the] Family Dollar" on Soundview Avenue depicting two of the robbers, one of whom is wearing what appears to be the Hoodie, entering the store. Exhs. 102A.1-.2; *see* Tr. at 184-85 (receiving the videos in evidence following an authenticity stipulation).

¶ 4 (stipulating that "the date and time stamps indicated on" Exhibit 102L.1 and other exhibits of footage from that house "reflect the date and time as maintained by the cameras from which they were filmed"); Tr. at 238 (Detective Devito, when discussing this surveillance video from October 19, 2021, testifying that "[a] lot of times [the time stamps on video from private houses are] inaccurate"). Several individuals then exited that vehicle and began walking in the direction of the Family Dollar. Tr. at 239-40; Exh. 102C.1; *see also* Exh. 1402A. And then immediately after the robbery, those individuals returned to the same black Lincoln MKT and drove away. Tr. at 241.

The defense attacks this evidence, arguing that it only shows that "Hampton's car entered the Bronx a couple of hours *before* the robbery occurred"—not that "Hampton was actually in the vehicle." Reply at 5. But various pieces of evidence showed that this vehicle belonged to Hampton, including the vehicle registration information, Exh. 520, and material extracted from the Hampton Cellphone. On the Hampton Cellphone were photographs of Hampton standing with the car, Exhs. 619.1-.2, as well as text messages sent from that phone in which the writer called the car his "baby" and his "whip," Exhs. 656 at 4, 661 at 3; Tr. at 635, 637. The jury thus could have logically inferred that Hampton was the person driving his own car at the time, an inference bolstered by the cell site location data, discussed *infra*, showing the Hampton Cellphone to be in the area at the time. Moreover, while the jury may not have been able to discern the vehicle's license plate number from the surveillance footage, as Detective Devito testified, Hampton's Car is "very identifiable" because "the tail lights in the back are elongated horizontally," Tr. at 239—which was apparent from the surveillance footage, Exh. 102L.1.

The next category of evidence linking Hampton to the Second Robbery was cell site location data from Hampton and Haskins's cellphones. Consistent with the license plate reader

evidence from Hampton's Car, cell site location information showed the Hampton Cellphone connecting to cell sites near the Queensboro Bridge at 7:50 p.m. and then again in the South Bronx near the Willis Avenue Bridge at 8:14 p.m. as his car traveled in the direction of the Family Dollar. *Compare* Exh. 1201 at 9, *with* Exh. 402A-B; *see also* Tr. at 781-82.   The Hampton Cellphone then connected to cell site facilities near Haskins's Torry Avenue apartment at 8:31 p.m., 9:03 p.m., and 9:34 p.m. that same evening.  Exh. 1201 at 9-10.  Finally, Haskins's device connected to a cell site near the Family Dollar at 9:55 p.m., just five minutes after that robbery occurred.  *Id.* at 10.

Noting that the Hampton Cellphone never connected to a cell site in the immediate vicinity of the Family Dollar, the defense argues that this suggests Hampton was at the Torry Avenue apartment at the time of the robbery.  Motion at 4; Reply at 6.  While certainly a fair argument to make to the jury, the jury also could have reasonably arrived at a different conclusion from this evidence.  *See United States v. Snow*, 462 F.3d 55, 69 (2d Cir. 2006) ("Although, as [the defendant] argues, a reasonable juror may have reached a contrary conclusion, such matters are appropriately argued to the jury and are not grounds for reversal on appeal.").  The Hampton Cellphone connected to the cell sites near the Torry Avenue apartment *before* the robbery—not during the robbery.  *See* Exh. 1201 at 10.  The jury could have concluded that Hampton simply did not make any calls or send any text messages while driving from the apartment to the victim store's location and while committing the robbery, which would explain why the phone did not subsequently connect to a tower closer to the Family Dollar.  *See* Tr. at 770 (testimony that cell site data only contains data for when voice calls or text messages were sent or received from the phone).[10]

---

[10] This would make particular sense if, as discussed *infra*, Hampton held and brandished the gun during the robbery.  It would be logical that he would not have been on his cellphone while engaging in such conduct.

Indeed, that the Hampton Cellphone connected to a cell site facility near the apartment of an alleged participant in the robbery whose phone connected to a cell site near the robbery location right after the robbery supports an inference that Hampton was involved in that robbery. Furthermore, the Government's cell site location expert, Andrew Petersohn, acknowledged that in densely populated urban areas such as the Bronx, cellphones "regularly" connect to cell site towers that are not the closest due to the "many intervening structures" and the high number of cellphone users in the area.  Tr. at 763.  For all these reasons, the jury could have reasonably credited the cell site location data as placing the Hampton Cellphone—and therefore Hampton himself—near the Family Dollar on Soundview Avenue when the Second Robbery occurred.

The third category of evidence linking Hampton to the Second Robbery consists of physical evidence.  For example, the Government presented evidence allowing the jury to find that one of the individuals who committed the Second Robbery wore the Hoodie, and wore it inside-out, and that the robbers carried the Backpack—both of which appeared to be captured in surveillance videos of many of the other robberies.  *Compare* Exhs. 302A-B, 302C.1, 302D.1 (surveillance stills of the robbers walking towards the Second Robbery wearing what appeared to be the inside-out Hoodie and the Backpack), *with, e.g.*, Exhs. 303A.4, 303B.2, 304A.1, 311A.1, 313A, 313B.2 (surveillance video stills from inside the stores at subsequent robberies of a robber in what appeared to be the Hoodie), *and* Exhs. 303A.2, 304A.3, 307A.3, 309A.3, 310B.1, 311C.1 (surveillance video stills showing what appeared to be the Backpack at the scene of subsequent robberies).  In addition, the Hampton Cellphone contained a selfie of an individual with a mask wearing a hooded sweatshirt, which the Government argued, and which the jury could have concluded, was Hampton wearing the Hoodie the correct way instead of inside-out.  Exh. 617.1; Tr. at 879-80.  In addition, the Manager testified that one of the individuals was holding a "back

17

and gold" gun, Tr. at 183, which matches the description of the firearm recovered from the Torry Avenue apartment in Brandon Needham's bedroom, Exhs. 706; 706A; *see* Tr. at 106-07 (Special Agent Megan Quinn of the Bureau of Alcohol, Tobacco, Firearms and Explosives testifying that the gun recovered was a "firearm").  Hampton argues that this evidence does not conclusively prove that he was actually at the Second Robbery—just that the robbers from the Second Robbery might be the same as those from the other robberies.  Reply at 4-5.  But the jury also could have reasonably concluded that Hampton was the robber in the Hoodie in those other robberies and that the Backpack was used in the robberies.  *See Snow*, 462 F.3d at 69.

Finally, the Government presented other evidence extracted from the Hampton Cellphone which further connects him to the Second Robbery.  The cellphone contained searches for several Family Dollar locations, Exh. 641, as well as several cached images of Family Dollar stores, Exhs. 616, 616.1-.8.  And several hours after the Second Robbery, a message was sent from the Hampton Cellphone saying "I ma [sic] kill them today" and then responding to the question, "what it gonna be," with "Family Dollar."  Exh. 652.

In seeking a judgment of acquittal on Count Two, Hampton attacks various pieces of the Government's evidence in isolation.  But in assessing the sufficiency of the evidence under Rule 29, the Court looks "to the totality of the government's case and not to each element, as each fact may gain color from others."  *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999); *see also United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994).  When viewed together, and "in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government," *United States v. Walker*, 191 F.3d 326, 333 (2d Cir. 1999) (quoting *United States v Hernandez*, 85 F.3d 1023, 1030 (2d Cir. 1996)), there was sufficient evidence from which the jury could have concluded beyond a reasonable doubt that on October

19, 2021, Hampton knowingly and willfully obtained property from the Family Dollar, against its will, and by threatened force, and that his actions affected interstate commerce.

Hampton's motion for acquittal as to Count Two is therefore denied.

## B.     Count Four:  Brandishing a Firearm

Turning to Count Four, the Indictment charged that Hampton "during and in relation to [the Second Robbery], knowingly did use and carry a firearm, and, in furtherance of such crime, did possess a firearm, and did aid and abet the use, carrying, and possession of a firearm, which was brandished, during the [Second Robbery]."  Indictment ¶ 4.  As noted at trial, the crime of carrying or using a firearm in relation to, or possessing a firearm in furtherance of, a crime of violence, here, the Hobbs Act robbery charged in Count Two, has the following elements:

> *First*, that on or about the date alleged in the Indictment, which is October 19, 2021, Mr. Hampton knowingly used, carried, or possessed a firearm or any combination of those acts, or aided and abetted the use, carrying, or possession of a firearm by another; and
>
> *Second*, that Mr. Hampton used or carried the firearm during and in relation to, or possessed a firearm in furtherance of, the robbery charged in Count 2.

Tr. at 1010-11.  The jury also made a special finding that the firearm was in fact "brandished" in connection to Count Four.  Tr. at 1075.  To "brandish" a firearm is "to display all or part of the firearm, or otherwise make the presence of the firearm known to another person, in order to intimidate that person, regardless of whether the firearm is directly visible to that person."  18 U.S.C. § 924(c)(4).

In this case, there was sufficient evidence from which a jury could reasonably conclude that Hampton used and brandished a firearm during the robbery of the Family Dollar on October 19, 2021.  Specifically, the Manager testified that five men in masks walked into the store shortly before closing, and when she looked up she "saw a person and he was holding something that looked like a gun . . . under his sweater."  Tr. at 183.  She was then informed by her coworker that

the robbers were demanding money.  *Id.*  When shown the limited cellphone video of the robbers entering the store, the Manager clarified that "[t]he first person who walked in was the person who led everything" and "he was the person that had tapped me on the shoulder and I believe was holding what I believe was a gun." *Id.* at 186.  This video reveals that the first person to walk into the store was wearing the Hoodie—which is identifiable based on the thick grey stripe across the chest and the thinner white line on the back.  Exh. 102A.2.  It also looks similar to the sweatshirt worn by the masked man in the selfie on the Hampton Cellphone.  Exh. 617.1.  Thus, were the jury to have concluded that Hampton was the robber in the Hoodie who walked into the store first—which, as explained *supra*, would be a reasonable inference to make based on a comparison to the evidence from the other robberies—it could then have concluded from the Manager's testimony that Hampton brandished a firearm in order to effect the robbery.

Hampton attacks the Manager's testimony as equivocal: she testified that she saw "something that *looked* like a gun," and that she "*believe*[*d* it] was a gun."  Tr. at 183, 186 (emphasis added); *see* Motion at 6.  Such uncertainty, argues Hampton, "does not suffice, especially without any other detail that could help establish the item the manager observed in a split second was indeed a real firearm."  Motion at 6; *see also* Reply at 8.  But the Manager, who testified that her Family Dollar gets robbed "all the time," Tr. at 182; *see also id.* at 187, recalled that one of the robbers "was holding what I believe was a gun" and described the gun as "black and gold."  *Id.* at 183, 186.  Law enforcement then recovered a real firearm matching that description from the Torry Avenue apartment where Hampton was located at the time.  Exhs. 706; 706A; *see* Tr. at 107-08 (Special Agent Quinn testifying that the gun recovered was a "firearm").[11]

---

[11] This case therefore did not present a situation like the one in *United States v. Padilla*, a decision upon which Hampton relies, Motion at 6, where it was unclear whether witnesses had an

Hampton also argues that the Manager's description of the gun as "black and gold" actually exculpates him because the only firearm matching that description was found in Needham's room, whereas the gun found in Hampton's Car—the Smith & Wesson—is black and blue.  Motion at 6-7; *see* Tr. at 125, 127.  But the fact that the black and gold firearm was found closer to Needham than Hampton does not conclusively prove that the gun belonged to Needham, or, for that matter, that Needham was the one who brandished the weapon during the Second Robbery.  To the contrary, viewing the evidence in light most favorable to the Government, the fact that a black and gold firearm was recovered in an apartment in which Hampton was located further supports the conclusion that Hampton brandished a firearm during the Second Robbery.

But even if one of the robbers besides Hampton brandished the gun during the Second Robbery, the jury could still have found Hampton guilty of Count Four on a theory of aiding and abetting.  To convict Hampton on such a theory, the jury must have found, among other things, that Hampton had "advance knowledge that a confederate would use or carry [and brandish] a gun during the crime's commission."  *Rosemond v. United States*, 572 U.S. 65, 67 (2014).  Hampton argues that "the Government introduced no evidence at trial to support an aiding and abetting theory" and so "the jury necessarily would have had to speculate or draw specious inferences from the evidence actually offered in order to conclude that Mr. Hampton had that actual knowledge." Motion at 7.  But "it is rare to have direct evidence of a person's state of mind" and so the jury may "infer a person's knowledge . . . from, for example, his or her statements or conduct, or *from the circumstances*."  *United States v. Flores*, 945 F.3d 687, 715 (2d Cir. 2019) (emphasis added).  In this case, the circumstances of the Second Robbery provided a sufficient basis from which the

---

opportunity to look at the weapon and law enforcement never located a gun.  No. CR 21-1338 JB, 2023 WL 315634, at *7-8 (D.N.M. Jan. 19, 2023).

jury could infer actual knowledge.  When five robbers walk into a store and one of them promptly points a gun at the employee and demands cash, a logical inference is that the other robbers had knowledge of the plan to rob the store at gunpoint.  This is especially true where, as here, the jury could find that the same robbers committed a similar robbery (also at gunpoint) the previous day[12] and proceeded to commit several additional robberies in a similar fashion.

Accordingly, because there is sufficient evidence for a reasonable jury to find that Hampton knowingly used or carried a firearm during the Second Robbery, possessed a firearm in furtherance of the Second Robbery, or aided and abetted such use, carrying, or possession, with the firearm having been brandished, Hampton's motion with respect to Count Four is denied.

### IV.  Constitutional Challenge

The Court concludes with Hampton's constitutional challenge to Count Five, the felon-in-possession count.  Hampton argues that 18 U.S.C. § 922(g)(1) violates the Second Amendment.[13] The Court interprets Hampton's motion as a facial challenge.  *See* Motion at 1 (stating generally that "[t]he statute with which Mr. Hampton was charged with violating in Count Five . . . does not pass Constitutional muster" and that "the Court should declare 18 U.S.C. § 922(g) unconstitutional").  "A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications."  *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019). Typically, "[w]hen a defendant has already been convicted for specific conduct under the

---

[12] "On October 18, 2021, at approximately 9:04 p.m., a robbery was committed at a Family Dollar located . . . in Brooklyn . . . . $1,300 in cash and a backpack were stolen."  Exh. 1100 ¶ 1. As Detective Devito testified, during this robbery, the robbers entered the store and one displayed a firearm.  Tr. at 224; *see* Exh. 101B.2.  The employee then brought the robber, who was wearing a hoodie, to the back office where the robber began placing cash into the Backpack, which at the time had been sitting on the ground.  Tr. at 225-26; Exh. 101B.2.  The robbers then exited the store with the money and the Backpack.  Tr. at 226-27; Exh. 101B.2.

[13] As discussed at a pretrial conference on October 21, 2022, Hampton opted to bring his constitutional challenge to section 922(g)(1) as a post-trial motion.  *See* Dkt. 88 at 5.

challenged law, a court considering a facial challenge to a criminal statute must examine the complainant's conduct before analyzing other hypothetical applications." *United States v. Decastro*, 682 F.3d 160, 163 (2d Cir. 2012) (internal quotation marks omitted). Thus, "a defendant who fails to demonstrate that a challenged law is unconstitutional as applied to him has necessarily failed to state a facial challenge." *Id.* (internal quotation marks omitted). In this situation, however, "[g]iven *Bruen*'s recency, the case law has not yet developed the parameters of an as-applied Second Amendment challenge." *United States v. Rowson*, No. 22 Cr. 310 (PAE), 2023 WL 413037, at *13 n.12 (S.D.N.Y. Jan. 26, 2023). Moreover, the parties have not presented sufficient factual details concerning Hampton's underlying felony to allow the Court to assess section 922(g)(1)'s application to Hampton in particular. However, when analyzed with respect to felons in general, the Court finds that section 922(g)(1) does not violate the Second Amendment under established Second Circuit precedent.[14]

## A.    Applicable Law

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend II. It thus "confer[s] an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). But, as the Supreme Court has made clear, that

---

[14] In so holding, this Court joins many others, both in this Circuit and around the country, in upholding section 922(g)(1) in the wake of *Bruen*. *See, e.g.*, *United States v. Jackson*, No. 22-2870, 2023 WL 3769242, at *4-7 (8th Cir. 2023) (denying an as-applied challenge); *United States v. Garlick*, No. 22 Cr. 540 (VEC), 2023 WL 2575664, at *4-5 (S.D.N.Y. Mar. 20, 2023); *United States v. Barnes*, No. 22 Cr. 43 (JPO), 2023 WL 2268129, at *1-2 (S.D.N.Y. Feb. 28, 2023); *see also Range v. Att'y Gen.*, 53 F.4th 262, 268 n.6 (3d Cir. 2022) (collecting cases), *vacated and rehearing en banc granted by* 56 F.4th 992 (3d Cir. 2023); *Rowson*, 2023 WL 413037, at *14 n.14 (collecting cases). *But see Range v. Att'y Gen.*, No. 21-2835, 2023 WL 3833404 (3d Cir. June 6, 2023) (concluding that section 922(g)(1) is unconstitutional as applied to an appellant who was previously convicted of making false statements to obtain food stamps).

right is "not unlimited."  *Id.*; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010)

(plurality) ("[T]he right to keep and bear arms is not a right to keep and carry any weapon

whatsoever in any manner whatsoever and for whatever purpose." (internal quotation marks

omitted)).  Under the Supreme Court's recent decision in *Bruen*, "the standard for applying the

Second Amendment is as follows:  When the Second Amendment's plain text covers an

individual's conduct, the Constitution presumptively protects that conduct.  The government must

then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition

of firearm regulation."  *Bruen*, 142 S. Ct. at 2129-30.[15]

## B.   Discussion

The Government argues that Hampton's constitutional challenge fails for three reasons.

First, section 922(g)(1) is constitutional under Supreme Court and Second Circuit precedent which

*Bruen* did not overrule—and even affirms.  Opposition at 31-34.  Second, under *Bruen*'s textual

inquiry, Hampton and other convicted felons are not included in "the people" whom the Second

Amendment protects.  *Id.* at 35-39.  And third, *Bruen*'s historical inquiry reveals that section

922(g)(1) is consistent with historical regulations disarming groups perceived to be dangerous.  *Id.*

at 39-48.  Because the Court agrees with the Government's first argument, it need not address the

second two.

---

[15] *Bruen* thus supplanted the "a 'two-step' framework for analyzing Second Amendment
challenges that combines history with means-end scrutiny" around which the Courts of Appeals,
including the Second Circuit, previously "coalesced."  *Bruen*, 142 S. Ct. at 2125.  Under that
framework, courts would first "determine whether the challenged legislation impinges upon
conduct protected by the Second Amendment," and if so, "the appropriate level of scrutiny to apply
and evaluate the constitutionality of the law using that level of scrutiny."  *United States v. Jimenez*,
895 F.3d 228, 232 (2d Cir. 2018).  *Bruen*'s new framework essentially removes the second step—
the means-ends balancing—from the inquiry.  *See Bruen*, 142 S. Ct. at 2127 ("Despite the
popularity of this two-step approach, it is one step too many.").  "The *Bruen* test," therefore, "turns
on textual and historical analysis alone."  *Rowson*, 2023 WL 431037, at *12.

Throughout its modern Second Amendment jurisprudence, the Supreme Court has consistently limited its recognition of Second Amendment rights to "law-abiding citizens" and has noted its approval for felon-in-possession laws.  In *Heller*, for example, the Supreme Court struck down the District of Columbia's "ban on handgun possession in the home" and "its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense."  554 U.S. at 635.  In doing so, the Court recognized the core of the Second Amendment as "the right of *law-abiding*, responsible citizens to use arms in defense of hearth and home."  *Id.* (emphasis added).  The *Heller* Court made clear "the right secured by the Second Amendment is not unlimited" and that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons."  *Id.* at 626; *see also id.* at 626-27 n.26 (characterizing the felon-in-possession law as a "presumptively lawful regulatory measure[]").

Two years later, in *McDonald*, the Court reaffirmed *Heller*, holding that the Second Amendment right to possess handguns in the home for the purpose of self-defense is "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition."  561 U.S. at 767-68, 778 (internal quotation marks and emphasis omitted).  As such, a plurality of the Court held that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right against state and local governments.  *Id.* at 791.  The plurality "repeat[ed] *Heller*'s] assurances' that "our holding d[oes] not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons."  *Id.* at 786 (internal quotation marks omitted).[16]

---

[16] Justice Thomas declined to join the plurality due to a disagreement as to the basis for Fourteenth Amendment incorporation.  *See McDonald*, 561 U.S. at 805-06 (Thomas, J., concurring) ("I agree with the Court that the Fourteenth Amendment makes the right to keep and bear arms set forth in in the Second Amendment 'fully applicable to the States.' . . . But I cannot

*Bruen* reaffirms the holdings of *Heller* and *McDonald*. *See, e.g.*, *Bruen*, 142 S. Ct. at 2122 (describing its holding as "consistent with *Heller* and *McDonald*"), 2126 ("In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."), 2127 (declining to adopt the Courts of Appeals' "two-step approach" because while "[s]tep one of the predominant framework is broadly consistent with *Heller*," "*Heller* and *McDonald* do not support applying means-ends scrutiny"), 2131 (characterizing the standard "appl[ied] today" as "the test we set forth in *Heller*"), 2131-32 ("Following the course charted by *Heller*, we will consider whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." (quoting *Heller*, 554 U.S. at 631)), 2134 ("Having made the constitutional standard endorsed in *Heller* more explicit, we now apply that standard to New York's proper-cause requirement."), 2138 ("Under *Heller*'s text-and-history standard, the proper-cause requirement is therefore unconstitutional."). Moreover, while the Court in *Bruen* recognized "an individual's right to carry a handgun for self-defense outside the home," *Bruen*, 142 S. Ct. at 2122, it consistently characterized the holders of the right as "law-abiding" citizens, *see id.* ("recogniz[ing] that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense" and "agree[ing]" with both parties that "ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense"), 2124-25 (describing the petitioners as "law-abiding, adult citizens"), 2131 (describing the Second Amendment as "the very product of an interest balancing by the people" which "surely elevates above all other interests the right of

---

agree that it is enforceable against the States through a Clause that speaks only to 'process.' Instead, the right to keep and bear arms is a privilege of American citizenship that applies to the States through the Fourteenth Amendment's Privileges or Immunities Clause."); *see also id.* at 812.

law-abiding, responsible citizens to use arms" (internal quotation marks omitted)), 2133 (directing courts to consider, among other things, "how and why the regulations burden a law-abiding citizen's right to armed self-defense"), 2134 ("It is undisputed that petitioners Koch and Nash— two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects."), 2138 (noting that there is no "historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need"), 2150 (similar), 2156 (similar, and concluding that "New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms").

Finally, while *Bruen*'s majority opinion did not include an explicit endorsement of felon-in-possession laws as in *Heller* and *McDonald*, it did acknowledge that the right to keep and bear arms is "subject to certain reasonable, well-defined restrictions." *Id.* at 2156. In addition, six of the nine Justices authored or joined separate opinions which, among other things, noted that *Bruen* does not disrupt or abrogate *Heller* and *McDonald*'s endorsements of felon-in-possession laws. Justice Alito, for example, "reiterate[d]" that "[a]ll that we decide in this case is that the Second Amendment protects the right of law-abiding people to carry a gun outside the home for self-defense and that the Sullivan Law . . . is unconstitutional," but that the Court's holding does not "disturb[] anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns." *Id.* at 2157, 2159 (Alito, J., concurring). Similarly, in a concurring opinion joined by Chief Justice Roberts, Justice Kavanaugh noted that when "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations," including limitations on the possession of firearms by felons. *Id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636). The three dissenting Justices also noted that they "underst[ood]

the Court's opinion today to cast no doubt on th[e] aspect of *Heller*'s holding" that felon-in-possession laws are "presumptively lawful."  *Id.* at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting).

Hampton rejects all this authority as mere "dicta" and thus "not the law."  *See* Reply at 13-14 ("Only the holding of the opinion of the Court is controlling law; approval of dicta in concurrences and dissents is not.").  That may be true, but "it does not at all follow that this Court can cavalierly disregard it."  *Cornwall v. Credit Suisse Grp.*, 729 F. Supp. 2d 620, 625 (S.D.N.Y. 2010) (internal quotation marks and brackets omitted); *see also United States v. Bell*, 524 F.2d 202, 206 (2d Cir. 1975) ("While . . . dictum is not binding upon us, it must be given considerable weight and can not [sic] be ignored in the resolution of the close question we have to decide." (footnote omitted)).  But more importantly, the Second Circuit has turned what Hampton characterizes as "dicta" in *Heller* and *McDonald* into binding precedent.  Following those cases, the Second Circuit held in *Bogle* that "Section 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons."  717 F.3d at 281-82.  In doing so, the Second Circuit rejected a defendant's argument that section 922(g)(1) violated his Second Amendment rights under "recent Supreme Court opinions [*i.e.*, *Heller* and *McDonald*] developing a more expansive interpretation of the Amendment," because "in both of these opinions, the Supreme Court clearly emphasized that recent developments in Second Amendment jurisprudence should not 'be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons.'" *Id.* at 281 (quoting *Heller*, 554 U.S. at 626).

Hampton argues that *Bogle* is "no longer good law" because the Second Circuit employed a "now-defunct" means-ends analysis in assessing Second Amendment challenges "from at least 2012 up until *Bruen*," thus including the time when *Bogle* was decided.  Reply at 13-14.  But *Bogle*

does not utilize any means-ends interest balancing.  Rather, the Second Circuit reasoned purely from language in *Heller* and *McDonald* expressly affirming "longstanding prohibitions on the possession of firearms by felons."  *Bogle*, 717 F.3d at 281 (internal quotation marks omitted). With *Heller* and *McDonald* still in full force after *Bruen*, *Bogle* remains binding precedent within this Circuit on the constitutionality of section 922(g).  *See Garlick*, 2023 WL 2575664, at *5 ("*Bruen* does not alter the holding of *Bogle*:  Section 922(g) is a constitutional regulation of the possession of firearms.  There is nothing in *Bruen* that suggests the Court saw that explication of the reach of the Second Amendment as disturbing the Supreme Court's dicta that 'longstanding prohibitions on the possession of firearms by felons' remain constitutional."); *Barnes*, 2023 WL 2268129, at *2 ("Because *Bruen* did not disturb either of those two precedents [*i.e.*, *Heller* and *McDonald*], the Second Circuit's holding in *Bogle* continues to govern this issue."); *cf. United States v. Peguero*, 34 F.4th 143, 158 (2d Cir. 2022) ("It is a longstanding rule that a panel of our Court is bound by the decisions of prior panels until such times as they are overruled either by an en banc panel of our Court or by the Supreme Court." (internal quotation marks omitted)).

In sum, binding Second Circuit precedent, which followed *Heller* and *McDonald*, holds that section 922(g)(1) is constitutional.  *Bruen* did not disturb this precedent.  The Court therefore denies Hampton's motion for a judgment of acquittal on Count Five.

### V.  Conclusion

For the foregoing reasons, Hampton's post-trial motion is denied.  The Clerk of Court is respectfully directed to close Docket Number 116.

SO ORDERED.

Dated: June 9, 2023
        New York, New York

_____
JOHN P. CRONAN
United States District Judge